[Cite as *In re E.R.M.*, 2020-Ohio-2806.]

# IN THE COURT OF APPEALS

# FIRST APPELLATE DISTRICT OF OHIO

# HAMILTON COUNTY, OHIO

IN RE: E.R.M.            :        APPEAL NO. C-190391
                                         TRIAL NO. F16-2532Z

                                   :            *O P I N I O N.*

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Reversed and Cause Remanded

Date of Judgment Entry on Appeal: May 6, 2020

*The Durst Law Firm* and *Alexander J. Durst,* for Appellants,

*R. Aaron Maus*, for Appellee Father,

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Jonathan Halvonik*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Keating Muething & Klekamp PLL* and *Tiffany Evans*, Guardian ad Litem for E.R.M.

1

**BERGERON, Judge.**

{¶1} In this parental custody case, the magistrate awarded legal custody to nonparents, but the juvenile court reversed course and granted custody to Father. In so doing, however, the juvenile court applied the incorrect legal standard and, while it purported to reject the magistrate's factual findings, it paradoxically seemed to stand by them. For the reasons that follow, we reverse the juvenile court's judgment.

I.

{¶2} This case began in November 2016 with the Hamilton County Department of Job and Family Services ("HCJFS") receiving interim custody of E.R.M. per an agreement with the child's mother and placing her in the care of Sara Geil, one of Mother's cousins. A couple of months later, in January 2017, the magistrate adjudicated E.R.M. dependent, committing her to the temporary custody of HCJFS. At the adjudication hearing, Mother stipulated to the complaint alleging her substance abuse and Father's absence from the child's life. Father did not attend the adjudication hearing, but instead appeared on the custody scene over a year later in April 2018.

{¶3} E.R.M. arrived in Ms. Geil's care with serious health concerns, including malnourishment, extensive dental issues, and a severe eating disorder, which required four months of "feeding therapy" at Cincinnati Children's Hospital. After her arrival, other concerns emerged as well, with E.R.M. receiving a diagnosis of Disinhibited Social Engagement Disorder, necessitating weekly therapy, and ADHD, requiring medication. But under Ms. Geil's care, E.R.M.'s mental and physical health rebounded, and she soon began to form strong relationships with Ms. Geil (and her two sons), within her neighborhood and school, and with Ms. Geil's close friends, Brian and Abbey Weber. In fact, spending time

with the Webers became a staple in E.R.M.'s life. With the Webers living a few minutes away, they spent frequent dinners together with the Geils, they regularly visited two or three times a week, they provided childcare for the Geils, and E.R.M. spent several overnights at the Webers' home.

{¶4} After developing this close relationship, the Webers eventually moved for legal custody of E.R.M. in April 2018, just a few days prior to Father's appearance in these proceedings. From the age of one to five years old, Father remained absent from E.R.M.'s life, but after learning from a relative that she was in foster care, he began participating in case plan services and visiting his daughter at the Family Nurturing Center ("FNC"). A few months later, in September 2018, Father also filed his own legal custody petition for E.R.M. And in January 2019, a trial proceeded on the competing motions.

{¶5} At trial, both the guardian ad litem ("GAL") and Mother advocated that the court award legal custody to the Webers, while HCJFS supported granting legal custody to Father, endorsing the Webers in the alternative. In support of her recommendation, the GAL emphasized the routine and consistency the Webers could provide, allowing E.R.M. to stay in the same school district and neighborhood, continue seeing her current doctor, therapist, and dentist, and maintain her strong relationship with Ms. Geil, her children, and E.R.M.'s network of friends. Mother echoed these sentiments, maintaining E.R.M. is "thriving where she is," and thus moving her to "another city, another place with somebody that she's not as familiar with" would run counter to her best interest. On the other hand, Father insisted that the best interests of E.R.M. would be served by placing her with her biological father, noting the growing relationship the two of them share and his consistent

and successful visits with E.R.M. during the months leading up to trial, including unsupervised weekend visits at his house.

{¶6} Ultimately, after sifting through all the evidence, the magistrate accepted the GAL's recommendation, granting legal custody of E.R.M. to the Webers, thereby denying Father's motion for legal custody. In doing so, the magistrate found that E.R.M. needs "stability and routine," and thus placing E.R.M. with the Webers was in her best interest since she will be able "to maintain her relationship with the [Geils], her friends at school, and her friends in the neighborhood," as well as "remain in the same school and maintain the same mental health providers and doctors."

{¶7} Father lodged objections to the magistrate's decision, maintaining that the magistrate "ignored the legal preference for the father and an award of custody to the Webers was not in the best interests of the child." And after a hearing on these objections, the juvenile court concurred with Father, rejecting the magistrate's decision and instead granting legal custody to Father. But, in doing so, the juvenile court did not take issue with any of the magistrate's specific best interest findings. To the contrary, the juvenile court reiterated several of the facts the magistrate relied upon before leaning on the Father's suitability to render its award: "[T]here is very little else Father can do at this point to prove he is a suitable caregiver."

{¶8} In the wake of this ruling, the Webers appeal, raising three assignments of error. As to the first and second assignments of error, the Webers challenge the juvenile court's decision to grant legal custody to Father, contending that the court relied on an incorrect legal standard and challenging the court's best interest determination. In their

4

third assignment of error, the Webers question the timeliness of Father's objections to the magistrate's decision. The GAL echoes these arguments, joining the Webers' brief.

II.

{¶9} Because the Webers' third assignment of error presents an alleged jurisdictional issue, we consider it first. The Webers contend that the juvenile court erred in sustaining Father's objections to the magistrate's decision when those objections were untimely. Pursuant to Juv.R. 40(D)(3)(b)(i), "[a] party may file written objections to a magistrate's decision within fourteen days of the filing of the decision[.]" Although contained within the civil rules, Civ.R. 6(A) provides guidance in calculating time: "[t]he last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday, in which event the period runs until the end of the next day which is not a Saturday, a Sunday, or a legal holiday." Although this court has yet to apply Civ.R. 6 to Juv.R. 40 for purposes of calculating time, we have recognized that Juv.R. 40 and Civ.R. 53 are analogous, and therefore it is appropriate to rely on Civ.R. 53(D) jurisprudence when examining similar provisions within Juv.R. 40(D). *See In re A.T.*, 1st Dist. Hamilton Nos. C-160597, C-160598 and C-160599, 2017-Ohio-5821, ¶ 6 ("Because the corollary Rule of Juvenile Procedure, Juv.R. 40, contains language identical to Civ.R. 53, we hold that the requirements outlined in our Civ.R. 53 jurisprudence are equally applicable to juvenile court entries regarding magistrate's decisions under Juv.R. 40."); *see also In re C.B.*, 12th Dist. Clermont No. CA2013-12-094, 2014-Ohio-3784, ¶ 12, fn. 1 ("[T]his court has held that Juv.R. 40(D) is analogous to Civ.R. 53(D) and therefore it is appropriate to rely on our case law examining similar provisions of Civ.R. 53(D)."). Reinforcing the point, Juv.R.

40(D)(3)(b)(i) and Civ.R. 53(D)(3)(b)(i) contain identical language governing the filing of objections to a magistrate's decision.

{¶10}   As the Webers properly note, the magistrate in this case entered her decision granting the Webers legal custody on February 4, 2019, rendering February 18, 14 days later, the due date for Father's objections.  Although the Webers insist that Father's filing on February 19 is accordingly late, that argument falls by the wayside when we look at Civ.R. 6, since February 18, 2019, was President's Day, a legal holiday when the Hamilton County Juvenile Court was closed.  That accordingly renders the filing deadline the next day, February 19, and saves the timeliness of Father's application.  *See Cent. Mtge. Co v. Webster*, 5th Dist. Stark No. 2011 CA 00005, 2011-Ohio-4442, ¶ 18 ("The filing deadline in the present case was November 11, 2010 but because November 11, 2010 was a legal holiday, the filing deadline became the next day of court, which was November 12, 2010. Appellant's objections to the magistrate's decision were timely filed on November 12, 2010.").  Accordingly, the juvenile court properly considered Father's objections, and we overrule the Webers' third assignment of error.

## III.

{¶11}   Turning now to the Webers' substantive arguments, we address their first and second assignments of error together given their overlapping nature.  Featuring language within the juvenile court's entry, the Webers contend that the court relied upon the wrong legal standard, appropriating an analysis fashioned for private custody disputes, which necessitates the court first find the parent "unsuitable" before awarding legal custody to a nonparent.  Accordingly, the Webers maintain that when evaluating the legal custody

determination through the proper "best interest" lens, the juvenile court abused its discretion in awarding legal custody to Father.

{¶12} We review the juvenile court's decision to reject the magistrate's decision and grant legal custody to Father for an abuse of discretion. *See In re A.W.*, 1st Dist. Hamilton No. C-140142, 2015-Ohio-489, ¶ 10 ("As an appellate court, we review a juvenile court's decision to grant legal custody under an abuse-of-discretion standard."); *In re L.M.L.*, 11th Dist. Portage No. 2016-P-0069, 2017-Ohio-7451, ¶ 20, quoting *In re Wiley,* 11th Dist. Portage No. 2008-P-0062, 2009-Ohio-290, ¶ 20 (" 'In reviewing a trial court's decision to adopt or reject a magistrate's decision, an appellate court looks for abuse of discretion.' "). Generally, an abuse of discretion exists if competent, credible evidence does not support the juvenile court's decision regarding the child's best interest or if the court applies the wrong legal standard. *See In re M.*, 1st Dist. Hamilton No. C-170008, 2017-Ohio-1431, ¶ 30 ("An abuse of discretion exists if the court's decision regarding the child's best interest is not supported by competent, credible evidence."); *In re L.R.M.*, 2015-Ohio-4445, 42 N.E.3d 799, ¶ 16 (12th Dist.), quoting *Musson v. Musson*, 11th Dist. Trumbull No. 2013-T-0113, 2014-Ohio-5381, ¶ 15 ("An abuse of discretion may be found when the trial court ' "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." ' "). With that standard in mind, we ultimately find an abuse of discretion here based upon the juvenile court's application of the wrong legal standard in conjunction with a lack of competent, credible evidence supporting its decision that legal custody to Father was in E.R.M.'s best interest.

A.

**{¶13}** As noted above, the magistrate here adjudicated E.R.M. dependent pursuant to R.C. 2151.353. After a court adjudicates a child abused, neglected, or dependent, the court then has a menu of dispositional alternatives at the ready, including, among other things, granting legal custody to a relative or any other person who petitioned for legal custody. *See* R.C. 2151.353(A); *In re A.W.* at ¶ 8 ("When a child has been adjudicated abused, neglected, or dependent, the juvenile court has a number of dispositional alternatives available to it."). When entertaining these options, the juvenile court's primary focus must remain on the best interest of the child. *See In re Allah*, 1st Dist. Hamilton No. C-040239, 2005-Ohio-1182, ¶ 10 ("[W]hen a court chooses among the dispositional options, the best interest of the child is the primary consideration.").

**{¶14}** The juvenile court here ultimately held "it is in [E.R.M.'s] best interest to be placed in the legal custody of Father[.]" However, in doing so, the juvenile court referenced Father's suitability on two occasions, both times employed as if to rebut the facts that supported legal custody to the Webers:

> The GAL raised concerns of Father's plans for child care, and establishing new
>
> medical providers for Child, but otherwise Father is a suitable caregiver.
>
> * * *
>
> If Child was placed with [the Webers], they would admittedly be able to
>
> provide more stability to Child's current routine, and allow her to spend
>
> significantly more time with [Ms. Geil]. Placing Child with Father will most
>
> likely cause a greater disruption to Child's current routine than if Child were

to be placed with [the Webers]. However, there is very little else Father can do

at this point to prove he is a suitable caregiver.

But suitability is not the driver here. As the Webers properly note, language concerning "suitability" originates from cases involving private custody disputes in domestic relations courts pursuant to R.C. 3109.04 and in juvenile courts pursuant to R.C. 2151.23 where the trial court must evaluate the parent's suitability before awarding legal custody of the child to a nonparent. *See In re Perales*, 52 Ohio St.2d 89, 369 N.E.2d 1047 (1977), syllabus ("In an R.C. 2151.23(A)(2) child custody proceeding between a parent and a nonparent, the hearing officer may not award custody to the nonparent without first making a finding of parental unsuitability[.]"); *In re Hockstok*, 98 Ohio St.3d 238, 2002-Ohio-7208, 781 N.E.2d 971, syllabus ("In a child custody case arising out of a parentage action between a natural parent of the child and a nonparent, a trial court must make a parental unsuitability determination on the record before awarding legal custody of the child to the nonparent."). Under the statute at hand, R.C. 2151.353, no such requirement exists. *See In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 1188, ¶ 21. ("[N]o statute requires a finding of parental unfitness as a prerequisite to an award of legal custody in cases where a child is adjudged abused, neglected, or dependent."). Once a court adjudicates a child abused, neglected, or dependent, it implicitly renders a determination that the parent is unsuitable, and thus the court need not revisit that question before granting legal custody of the child to a nonparent. *See id.* at ¶ 22 ("[A]buse, neglect, or dependency adjudications implicitly involve a determination of the unsuitability of the child's parents."); *In re A.C.*, 1st Dist. Hamilton No. C-140273, 2015-Ohio-153, ¶ 9 ("Once a child has been adjudicated abused, neglected, or

dependent, a trial court need not first find that a noncustodial parent is unsuitable before placing a child with a nonparent or nonrelative.").

{¶15} Because this legal custody case fell within the confines of R.C. 2151.353, the primary focus or inquiry underlying the juvenile court's decision should have been the best interest of E.R.M. (Emphasis sic.) *See In re L.M.L.*, 11th Dist. Portage No. 2016-P-0069, 2017-Ohio-7451, at ¶ 21, quoting *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979) ("Accordingly, 'the *fundamental* or *primary* inquiry at the dispositional phase of (* * *) juvenile proceedings is not whether the parents of a previously adjudicated "dependent" child are either fit or unfit,' rather, it is 'the best interests and welfare of the child (that) are of paramount importance.' "); *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829, ¶ 11 ("Once the case reaches the disposition phase, the best interest of the child controls."). We cannot say with any confidence that the court's chief consideration here was E.R.M.'s best interest, given its reliance on suitability and the absence of any analysis of how the magistrate went astray. *See In re T.K.M.*, 1st Dist. Hamilton No. C-190020, 2019-Ohio-5076, ¶ 24 ("The status of the child is the focus, not the fitness of the parents."). As discussed in more detail below, the court merely cited the best interest factors within R.C. 2151.414(D) but failed to assign these factors to any of the facts and instead relied on facts that pointed in the opposite direction. Accordingly, because the juvenile court invoked the wrong legal standard, we must sustain the Webers' first assignment of error.

B.

{¶16} We likewise find reversible error based upon the lack of competent, credible evidence supporting the court's best interest determination. As noted above, a juvenile

10

court's decision to grant legal custody must be rooted in the best interests of the child. *See In re D.M.*, 1st Dist. Hamilton No. C-140648, 2015-Ohio-3853, ¶ 11 ("A court's determination of legal custody must be based on the best interests of the child."). R.C. 2151.353, however, fails to set forth any criteria for the juvenile court to employ when reaching this determination in a legal custody proceeding. *See In re A.W.*, 1st Dist. Hamilton No. C-140142, 2015-Ohio-489, at ¶ 8 ("[T]he statutory scheme does not delineate a specific set of factors or criteria that the juvenile court must apply when determining the best interests of a child in a legal-custody proceeding[.]"). In the absence of statutory guidance, this court has previously turned to the best interest factors articulated in both R.C. 2151.414(D), governing permanent custody cases, and R.C. 3109.04(F), controlling private custody matters in domestic relations courts. *See In re F.B.D.*, 1st Dist. Hamilton No. C-180356, 2019-Ohio-2562, ¶ 12 (noting several cases where this court held "the best-interest factors set forth in R.C. 2151.414(D) are instructive" and "the court may consider the factors in R.C. 3109.04(F)."). Notably, "[b]ecause an award of legal custody does not divest parents of their residual parental rights, privileges, and responsibilities, appellate courts apply a preponderance of the evidence standard to the juvenile court's factual findings." *In re A.W.* at ¶ 9.

{¶17} While the magistrate here cited neither R.C. 2151.414(D) nor 3109.04(F) explicitly, she nevertheless considered various factors set forth in both when reaching her decision that legal custody to the Webers was in E.R.M.'s best interest. In her entry, the magistrate noted several of the important relationships in E.R.M.'s life, including her "close bond" with the Webers, her strong relationship with the Geils, and her connection with her mental health providers, doctors, and school and neighborhood friends. *See* R.C.

2151.414(D)(1)(a) ("The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child[.]"); R.C. 3109.04(F)(1)(c) ("The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest[.]"). The magistrate also emphasized the relationship between Father and E.R.M., noting that "[she] enjoys her time with [Father]," but balanced this against Father's absence for much of her life. *See* R.C. 2151.414(D)(1)(e) (directing the court to review the factors in divisions (E)(7) to (11)); R.C. 2151.414(E)(10) ("The parent has abandoned the child.").

{¶18} The magistrate further highlighted the GAL's report, advocating that E.R.M. should reside with the Webers. *See* R.C. 2151.414(D)(1)(b) ("The wishes of the child, as expressed * * * through the child's guardian ad litem[.]"). In her report, the GAL thoroughly chronicled E.R.M.'s history—describing her first four years of life as "mercurial"—and special needs, i.e., her previous malnourishment, current eating disorder, dental issues, diagnosis of ADHD, and Disinhibited Social Engagement Disorder. Based upon her needs and history, the GAL emphasized that "[s]tability, therefore, is the most important gift this Court can give [E.R.M.]. * * * [She] is thriving because of the routine and consistency Ms. Geil has provided since this case began." One of the HCJFS's social workers similarly attributed E.R.M.'s improvements to her current home and "significant bond with [the Geils]."

{¶19} Mindful of this evidence, the magistrate credited much of E.R.M.'s improvements to Ms. Geil's ability to provide stability, ultimately finding that the Webers presented the best option to enable her to continue to progress. If placed with the Webers,

E.R.M. could stay in the same school district, maintain her neighborhood friendships and medical providers, and continue her relationship with the Geils—Ms. Geil would provide childcare for the Webers before and after school. In contrast, the magistrate reasoned that Father simply could not provide the same stability as the Webers, living almost an hour away from the Geils and E.R.M.'s community. Although Father insisted at trial that he would attempt to retain E.R.M.'s current medical providers, at that time, he had not reached out to her providers nor resolved whether his insurance would cover their services. Comparing the two alternatives, the magistrate ultimately found that the Webers provided the "least amount of transition" at a time when she needs stability and routine. *See* R.C. 2151.414(D)(1)(d) ("The child's need for a legally secure permanent placement[.]"); R.C. 3109.04(F)(1)(d) ("The child's adjustment to the child's home, school, and community[.]").

{¶20} Finally, the magistrate traced E.R.M.'s custodial history, residing with Ms. Geil since December 2016 (a little over two years at the time of trial), and Mother's wishes for the Webers to gain custody since she "knows the Webers better than she knows Father." *See* R.C. 2151.414(D)(1)(c) ("The custodial history of the child[.]"); R.C. 3109.04(F)(1)(a) ("The wishes of the child's parents regarding the child's care[.]").

{¶21} On Father's objections, the juvenile court did not take any new evidence, and thus the record stands as it was before the magistrate. On the one hand, the juvenile court seemed to agree with the magistrate's assessment that custody to the Webers would provide the most stability and be in E.R.M.'s best interests, reiterating several of the same findings in which the magistrate rooted her best interest determination. Like the magistrate, the juvenile court noted that, if placed with the Webers, E.R.M. "would not have to change school districts, [or] medical providers" and "would still maintain significant contact with

13

[Ms. Geil]." The juvenile court also found Father was absent from E.R.M.'s life between the ages of one and five. And most notably, the juvenile court acknowledged that the Webers "would admittedly be able to provide more stability to [E.R.M.]'s current routine," while "[p]lacing [E.R.M.] with Father will most likely cause a greater disruption[.]" All of this comports with the magistrate's findings and seems to portend a custody determination in favor of the Webers.

{¶22} The juvenile court, however, summarily disagreed, concluding that "the Magistrate did not properly determine the factual issues when applying the law" and that "the Magistrate's Decision is not supported by the evidence." But the juvenile court fails to elucidate why. In similar fashion, while the court recites the standard of R.C. 2151.414(D)(1), the court fails to offer any analysis of this section or any fact probative of the best interest weighing in favor of Father. Nor does HCJFS fill in the gaps—it devotes only one paragraph in its brief to fashioning a best interest analysis (Father's brief stands similarly opaque on this point). While our standard of review is abuse of discretion, we must see evidence of how that discretion was exercised in order to conduct meaningful appellate review. *See In re Q.R.*, 12th Dist. Clinton No. CA2017-11-020, 2018-Ohio-4785, ¶ 14, quoting *In re Estate of Murray*, 11th Dist. Trumbull No. 2004-T-0030, 2005-Ohio-1892, ¶ 26 (" '[F]or this court to be able to conduct any meaningful review of the trial court's exercise of its discretion, we must be able to discern some basis for its decision.' ").

{¶23} Competent, credible evidence supported the magistrate's determination, and in many respects, the juvenile court seemed to agree with that. Without any contrary findings or analysis by the juvenile court, or really any developed argument by the parties,

we fail to see competent, credible evidence pointing the other direction. We accordingly sustain the Webers' second assignment of error.

IV.

{¶24} We hold that the juvenile court abused its discretion in rejecting the magistrate's decision and awarding Father legal custody of E.R.M. We accordingly sustain the Webers' first and second assignments of error but overrule their third. We therefore reverse the juvenile court's judgment sustaining Father's objections, rejecting the magistrate's decision, and awarding legal custody of E.R.M. to Father, and remand this matter for entry of an award of legal custody to the Webers consistent with the magistrate's decision.

Judgment reversed and cause remanded.

**ZAYAS, P.J.,** and **CROUSE, J.,** concur.

Please note:

The court has recorded its own entry this date.